## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| ) | |
| ) | Chapter 11 |
| In re: ) | |
| ) | |
| OSAGE EXPLORATION AND ) | Case No. 16-10308 |
| DEVELOPMENT, INC., ) | |
| ) | |
| Debtor. ) | |
| ) | |
| ) | |

**MOTION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (B) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING, (C) GRANTING SUPERPRIORITY SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS TO LENDER, (D) GRANTING ADEQUATE PROTECTION TO EXISTING LIEN HOLDERS; (E) SCHEDULING A FINAL HEARING; AND (F) GRANTING RELATED RELIEF**

**YOUR RIGHTS MAY BE AFFECTED. YOU SHOULD READ THIS DOCUMENT CAREFULLY AND CONSULT YOUR ATTORNEY ABOUT YOUR RIGHTS AND THE EFFECT OF THIS DOCUMENT.** A HEARING WILL BE CONDUCTED ON THIS MATTER AT THE UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF OKLAHOMA, OLD POST OFFICE BUILDING, 215 DEAN A. MCGEE AVENUE, OKLAHOMA CITY, OKLAHOMA, ON FEBRUARY 9, 2016, AT 9:30 A.M. IF YOU DO NOT WANT THE COURT TO GRANT THE REQUESTED RELIEF, YOU MUST FILE A WRITTEN RESPONSE OR OBJECTION SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING. YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF OKLAHOMA, 215 DEAN A. MCGEE AVENUE, OKLAHOMA CITY, OK 73102, NO LATER THAN NOON CST ON FEBRUARY 8, 2016. IN ADDITION TO FILING YOUR RESPONSE WITH THE CLERK, YOU MUST SERVE A FILE-STAMPED COPY OF YOUR RESPONSE OR OBJECTION ON THE SIGNING ATTORNEY AND TO ANY OTHER PARTY SPECIFIED. IF NO RESPONSE OR OBJECTION IS TIMELY FILED, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED WITHOUT HEARING.

EMERGENCY RELIEF AND AN EXPEDITED HEARING HAVE BEEN REQUESTED.  IF THIS COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS TIME TO RESPOND.  IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT AND IMMEDIATELY SERVE A COPY OF YOUR RESPONSE ON COUNSEL FOR THE DEBTORS AND ON ANY OTHER PARTY SPECIFIED.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEYS.

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

Osage Exploration and Development, Inc., debtor and debtor-in-possession in the above-captioned case (the "Debtor") files this *Motion for Interim and Final Orders (A) Authorizing the Debtors to Use Cash Collateral, (B) Authorizing the Debtors to Obtain Post-Petition Financing, (C) Granting Superpriority Security Interests and Superpriority Administrative Expense Status to Lender, (D) Granting Adequate Protection to Existing Lienholders; (E) Scheduling a Final Hearing; and (F) Granting Related Relief* (the "Motion") and in support thereof, respectfully states as follows:

## JURISDICTION AND PROCEDURAL BACKGROUND

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.  This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      On February 3, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing the above-captioned bankruptcy case (the "Case").

4.      Since the Petition Date, the Debtor has continued to operate and manage its business as Debtor in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

5.      As of the date hereof, an official committee of unsecured creditors (the "Committee") has not yet been appointed in the Case.

6.      A description of the Debtor's business, the reasons for filing the Case, and the relief sought from this Court to allow for a smooth transition into operations under chapter 11 is set forth in the First Day Declaration, which was filed contemporaneously with this Motion [Docket No. 5]. The Debtor hereby incorporates the First Day Declaration as if fully set forth herein.

## RELIEF REQUESTED

7.      By this Motion, the Debtor requests, *inter alia*, entry of an Interim Financing Order (the "Interim Financing Order") in substantially the form attached hereto as **Exhibit A** and a final order in substantially the form to be submitted to the Court at least 5 days in advance of the final hearing on this Motion (the "Final Financing Order", and together with the Interim Financing Order, the "Financing Orders") pursuant to §§ 105, 361, 362, 363 and 364 of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"):

> a.    authority for the Debtor to obtain post-petition loans and other extensions of credit from Apollo Investment Corporation or one or more of its affiliates ("**Apollo**") or any other lender entity designated by Apollo ("Lender", and specifically in its capacity as lender under the DIP Facility, "DIP Lender") in an amount not to exceed $400,000 on an interim basis (the "Interim Amount"), and $1,400,000 on a final basis, cumulative of any amounts advanced on an interim basis (the "DIP Commitment"), and including, without limitation, principal, other extensions of credit and financial accommodations, interest, fees, expenses, and other costs of Lender in this bankruptcy case (the "Case"), in accordance with the terms and conditions set forth herein and in the attached Osage Exploration and Development, Inc. Debtor-In-Possession (DIP) Financing Term Sheet (the "DIP Term Sheet") and a Senior Secured Super-Priority Debtor-in-Possession Note Purchase Agreement, or in respect of the Interim Amount, a short form note referencing this Order and the DIP Term Sheet, (such note or agreement, the "DIP

Agreement"),[1] the other Loan Documents (as defined in the DIP Agreement), and all other related agreements and documents (collectively, the "<u>DIP Facility</u>");

b.    authority for the Debtor to execute, deliver, and perform under the DIP Facility and Loan Documents, and all other related agreements and documents creating, evidencing, or securing indebtedness or obligations of the Debtor to the DIP Lender on account of the DIP Facility or granting or perfecting liens or security interests by the Debtor in favor of and for the benefit of DIP Lender on account of the DIP Facility, having priority over all other liens of any creditor or may hereafter be amended, modified, supplemented, ratified, assumed, extended, renewed, restated, or replaced, and any and all of the agreements and documents currently executed or to be executed in connection therewith or related thereto, by and among the Debtor and DIP Lender, the terms of which are referenced and incorporated herein as if set forth herein (collectively, including the DIP Term Sheet[2], the "<u>DIP Facility Documents</u>");

c.    approval of the terms and conditions of the DIP Facility and the DIP Facility Documents;

d.    authority for the Debtor to use Cash Collateral (as defined below) of Lender (both in its capacity as DIP Lender and in its capacity as First Lien Lender (as defined below)) in accordance with the terms and conditions set forth herein;

e.    modification of the automatic stay of Bankruptcy Code § 362 (the "<u>Automatic Stay</u>") to the extent provided herein;

f.    granting of automatically perfected first priority liens and security interests to DIP Lender to secure the DIP Obligations pursuant to Bankruptcy Code §§ 364(c)(2) 364(d), and granting liens, security interests, and other adequate protection to Lender with respect to their interests in all of the Debtor's assets, the DIP Collateral and the Prepetition Collateral (as defined below);

g.    authorizing the indefeasible transfer of Cash Collateral of Lender to and for the benefit of Lender as set forth herein; and

h.    scheduling a final hearing (the "<u>Final Hearing</u>") to consider entry of the Final Financing Order on the Motion.

---

[1] A copy of the DIP Agreement in the form of a promissory note for the interim amount is attached hereto as **Exhibit 1** to the proposed Interim Financing Order attached as **Exhibit A**, and incorporated herein as if set forth *in haec verba*. To the extent that the DIP Agreement is expanded or modified following the Interim Hearing Date (as defined below) through a more detailed loan agreement, note purchase agreement or otherwise, a copy of such agreement(s) shall be filed with the Court.

[2] A copy of a substantially final version of the DIP Term Sheet is attached as **Exhibit B.**

### Statement in Compliance with Bankruptcy Rule 4001(b) and (c)

8.     In compliance with Bankruptcy Rule 4001(b) and (c), the Debtor makes the following concise statement about the relief requested herein:[3]

    a.  Parties: The Debtor will be a borrower under the DIP Facility. Lender will be Lender under the DIP Facility.

    b.  Facility Amount:  Not to exceed at any time the aggregate principal amount of $400,000 on an interim basis.  Section 3.1 of the DIP Agreement.

    c.  Maturity Date:   Earlier of the occurrence of (i) April 25, 2016, (ii) the effective date of a chapter 11 plan with respect to the Bankruptcy Case, (iii) the sale of all or a substantial part of the assets of the Debtor and its subsidiaries (which, for the avoidance of doubt, shall include any sale of any oil and/or gas well operated by the Debtor as of the date hereof), and (iv) the date that the Loans shall become due and payable in full hereunder or pursuant to the DIP Order, whether by acceleration or otherwise.  Section 1 of the DIP Agreement.

    d.  Interest Rate: 8% per annum, payable in arrears at the end of every calendar month at maturity.  Default rate of 2% per annum in excess of the interest rate otherwise payable, payable upon and during continuance of event of default. The payment may be deferred for a period up to ninety days if requested by the Debtor due to liquidity constraints and consented to by the DIP Lender at the DIP Lender's sole discretion.  Section 3.3 of the DIP Agreement.

    e.  Fees:   2% of the principal amount of the DIP Facility, payable on the date of the applicable funding and 2% of the total amount advanced under the DIP Facility payable upon Maturity, or at the time of any earlier payments of DIP Facility to the extent of such payments. Section 3.11(e) and 3.8 of the DIP Agreement.

    f.  Restrictions on Availability of DIP Financing Advances.  (i) The Budget, (ii) the maximum amount of borrowings as set forth in the Financing Orders and the DIP Agreement, (iii) the meeting of conditions precedent set forth in Sections 3.10 and 3.11 of the DIP Agreement.

    g.  DIP Collateral and Security:

---

[3] This statement is a summary of certain terms and conditions set forth in the DIP Agreement and the Financing Orders.  Parties in interest should review the Interim Financing Order attached hereto as **Exhibit** A and the Term Sheet attached hereto as **Exhibit B** for further details. Reference is made to the DIP Agreement and the Financing Orders for a full and complete description of the DIP Facility.  To the extent this statement is inconsistent with the DIP Agreement and/or the Financing Orders, the DIP Agreement and the Financing Orders shall control. Capitalized terms not otherwise defined in this statement shall be given the meaning ascribed to them in the body of the Motion.

i.  Pursuant to Sections 364(c) and (d) of the Bankruptcy Code, all obligations of the Lender under the DIP Facility ("DIP Obligations") will be secured by security interests in all of the Debtor's and its bankruptcy estate assets (the "Collateral"), including proceeds and rights in respect of avoidance actions under sections 510, 544, 547, 548, 549, 550 and/or 551 of the Bankruptcy Code ("Avoidance Actions"). Collateral shall include all property that is not subject to a security interest or lien as of the Petition Date and property that is covered by a security interest or lien as of the Petition Date.  Such liens on the Collateral will be valid, enforceable and perfected first-priority priming liens and security interests, with priority over any and all prepetition or postpetition liens and, security interests and other interests including any and all mechanics and materialmens' liens ("M&M Liens") (except as set forth below) and shall be subject and junior only to (i) the Carve-Out Expenses; (ii) Budgeted Operating Expenses; and (iii) valid and enforceable M&M Liens in respect of the Everest 1-9MH well only ("Everest M&M Liens") to the extent such Everest M&M liens are valid, enforceable, non-avoidable, and perfected and are, under applicable law, senior to the prepetition liens and security interests of the Lender  in the Collateral, except to the extent the DIP Liens secure advances for the reasonable, necessary costs and expenses of preserving, or disposing of, the Everest 1-9MH well as determined by the Court under Bankruptcy Code §506(c) and (iv) valid and allowed claims of royalty interest and working interest holders for unpaid royalties arising after the Petition Date.  The DIP Lenders shall also have a superpriority administrative expense under section 364(c)(1) against the Debtor for the amount of all obligations under the DIP Facility, subject only to the Carve-Out Expenses and Budgeted Operating Expenses.  No person other than the Lender shall have a lien on the collateral, except for (i) the liens of the Prior Liens (including adequate protection liens provided herein) and (ii) Everest M&M Liens. [Interim Financing Order, ¶¶ 21-23 & 33-34].

ii.  Lender will be granted superpriority administrative claims and all other benefits and protections allowable under Bankruptcy Code §§ 507(b) and 503(b)(1), senior in right to all other administrative claims against the Debtor' estates, except for the Carve-Out. [Interim Financing Order, ¶ 23].

h.  <u>Event of Default/Termination</u>:  As is customary for this type of credit facility. Section 4.1 of the DIP Agreement.

i.  <u>Purpose for and Duration of DIP Facility and Use of Cash Collateral</u>:

i.  For general corporate purposes in accordance with the Credit Facility Documentation and the Budget, no proceeds of the DIP Facility and no cash collateral (including the Carve-Out Expenses), may be used in

connection with (a) the modification, stay, or amendment of the DIP Orders without the consent of the Lenders or (b) any litigation, proceeding or adverse action against, or challenge to the rights or liens of, the DIP Lender or the First Lien Lender. The Debtor may segregate proceeds into a separately designated bank account for payment of Carve-Out Expenses (the "Professional Fee Escrow"). Carve-Out Expenses will only be paid upon issuance of appropriate order(s) of the court for allowance of professional fees. Such segregation shall be limited to the amounts set forth in the Budget. [Interim Financing Order, ¶¶ 28-32]

ii. Lender's consent and Debtor's authority to use Cash Collateral and Lender's commitment to provide credit under the DIP Agreement and the Financing Orders, subject to the funding and Budget limitations therein, will be effective upon entry of the Financing Orders to and including the earlier of: (a) notice of the occurrence of an Event of Default or (b) April 25, 2016 at 4:00 p.m. (Central Time), at which time all of the Debtor's authority to use Cash Collateral and to obtain credit under the DIP Agreement and the Financing Orders will terminate, as will Lender's obligation to continue funding the DIP Facility, unless extended by written agreement of the parties hereto, a copy of which with an updated Budget will be promptly filed with the Court by the Debtor. [Interim Financing Order, ¶ 82]

j. <u>Material Terms for Use of Cash Collateral</u>:

i. A thirteen week budget to be agreed upon among the parties with respect to revenues and expenses (the "**<u>Budget</u>**"), a copy of which is attached as **<u>Exhibit 2</u>** to the Proposed Order, which is attached hereto as **<u>Exhibit A</u>**. An updated Budget for each successive four week period (or longer time agreed among the parties) shall be provided to DIP Lenders not less than two weeks prior to the end of the time period covered by the then effective Budget and shall be effective upon agreement by the parties. There shall be an event of default if (i) total disbursements for any weekly time period of the Budget shall have exceeded the total disbursements allowed in the Budget by more than 10%, (ii) total disbursements for any line item in the Budget for any weekly time period shall be exceed by more than the greater of 25% or $10,000, (iii) total net revenue for any post-petition production month received post-petition shall fall below $125,000 attributable to the Debtor's net revenue interest; or (iv) the Budget amount is exceeded by any amount for certain specific items to be agreed to by the parties. [Interim Financing Order, ¶ 28]

k. <u>Professional Fee Escrow; Carve-Out</u>.

i. Amounts set forth in the Budget for the fees and expenses of the Estate Professionals (as defined in the Financing Orders) will be set aside

weekly and held by the Debtor in the Professional Fee Escrow. The amount paid by the Debtor in any month for the fees and expenses of the Estate Professionals will only be paid upon allowance or authorization by the Court from funds on deposit in the Professional Fee Escrow and will not exceed the amount set forth in the Budget for such month. [Interim Financing Order, ¶ 29]

ii.   Lender additionally consents, subject to the terms and conditions set forth in the Financing Orders, to a carve out from their Collateral for the payment of (i) fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930 and (ii) the allowed professional fees and expenses of Estate Professionals in an amount not to exceed (a) the amounts set forth in the Budget and paid into the Professional Fee Escrow to be used to pay fees earned and expenses incurred prior to the occurrence of an Event of Default, plus (b) an aggregate amount not to exceed $75,000.00 to be used to pay fees earned and expenses incurred subsequent to the occurrence of an Event of Default (collectively, the "Carve-Out"). [Interim Financing Order, ¶ 50]

iii.  The Financing Orders prohibit Cash Collateral, the Carve-Out, or the Professional Fee Escrow from being used for the payment or reimbursement of certain identified fees, expenses, costs or disbursements, including, without limitation, any fees of any Estate Professional or other persons incurred with the purpose of objecting to the validity, extent, perfection, priority, or enforceability of the Pre-Petition Claims, the Pre-Petition Claim Documents, the DIP Facility, the DIP Facility Documents, the Financing Orders, or any liens or security interests granted thereby or with respect thereto, or any other rights or interests of Lender under any Pre-Petition Claim Document or DIP Facility Document, or investigating, asserting, prosecuting or the joinder in any claims or causes of action against Lender or any of their officers, directors, employees, affiliates, agents, attorneys, or equity holders. However, Cash Collateral deposited into the Professional Fee Escrow may be used to pay the fees and expenses of counsel to the Committee in an amount not to exceed $10,000.00 for reviewing the Pre-Petition Claims, the Pre-Petition Claim Documents, and any liens or security interest granted thereby. [Interim Financing Order, ¶ 52]

l.   No Surcharge; Marshaling Waiver; Release of Claims; Indemnity.

i.   No costs or expenses of administration will be charged against Lender, their claims or the Collateral pursuant to Bankruptcy Code § 506(c) without the prior written consent of Lender. Lender will not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral. [Interim Financing Order, ¶ 53 & 77]

      ii.  The Debtor will waive and release claims as more particularly set forth in the Interim Financing Order. The Debtor will have no right to file a complaint pursuant to Bankruptcy Rule 7001 or otherwise, or any other pleading asserting a claim or cause of action arising out of or related to the Pre-Petition Claim Documents, the DIP Agreement or any transactions or dealings related to same. [Interim Financing Order, ¶¶ 80].

m.  <u>Other Material Terms</u>.

      i.  Upon the occurrence of any Event of Default and without limitation to the other remedies set forth in the Financing Orders, and after the giving of seven (7) business days' notice by Lender, then without further act or action by Lender, or any further notice, hearing or order of this Court, the Automatic Stay will be immediately modified and Lender will be authorized, in their sole and absolute discretion, to take any and all actions and remedies that Lender may deem appropriate to proceed against, take possession of, protect, and realize upon the Collateral and any other property of any of the estates of the Debtor. Lender will not be obligated to take title to any of the Collateral in the pursuit of any of Lender's rights and remedies, and the Debtor will cooperate with Lender in conjunction with the exercise of any right and the pursuit of any remedy by Lender, without limitation. [Interim Financing Order, ¶ 56].

      ii.  Parties-in-interest (other than the Debtor) that have or have been granted standing will have thirty (30) days from the date of entry of the Interim Financing Order (or, in the case of the Committee, if appointed, thirty (30) days from the date of appointment of the Committee) to file a complaint pursuant to Bankruptcy Rule 7001 asserting a claim or cause of action arising out of the Pre-Petition Claim Documents, or otherwise challenging the extent, priority, validity, perfection, amount, or allowability of Lender's claims or security interests, arising out of the Pre-Petition Claim Documents. If no action is commenced in accordance with the foregoing or such deadlines are not extended in writing by Lender in its sole and absolute discretion, all of the Debtor' stipulations and affirmations of the allowance, priority, extent, and validity of Lender's claims, liens, and interests, and the Debtor' waivers and releases as contained in the Pre-Petition Claim Documents or otherwise incorporated or set forth in the Financing Orders will be forever binding upon the Debtor's bankruptcy estate and all creditors and parties-in-interest of the Case. [Interim Financing Order, ¶¶ 78-79]

n.  <u>Adequate Protection Granted to Lender</u>:  As adequate protection of Lender:

      i.  As adequate protection of Lender's interest in the Collateral and the Cash Collateral, Debtor shall pay $75,000 as set forth in the Budget until such time as the DIP Obligations have been indefeasibly paid and

satisfied in full in accordance with the Pre-Petition Claim Documents and the DIP Facility Documents. [Interim Financing Order, ¶ 49]

ii.  Subject only to Prior Liens, if any, the Carve-Out, and Lender's liens and security interests securing the DIP Facility, Lender will be granted, effective as of the Petition Date, valid and automatically perfected first priority replacement liens and security interests in and upon the Collateral.  [Interim Financing Order, ¶ 22]

iii.  To the extent any adequate protection is insufficient to adequately protect Lender's interest in the Collateral, Lender will be granted superpriority administrative claims and all of the other benefits and protections allowable under Bankruptcy Code §§ 507(b) and 503(b)(1), junior only in right to any superpriority administrative claims granted to Lender on account of the DIP Facility and the Carve-Out. [Interim Financing Order, ¶ 23]

iv.  During the Case, as additional adequate protection, all interest, fees, costs, and expenses, including attorneys' fees and expenses, due at any time to Lender under the Pre-Petition Claim Documents and/or the DIP Facility Documents (including, without limitation, the expenses described in Section 8.3 of the DIP Agreement), as applicable, or that are incurred as a result of the Debtor's Case (collectively, the "Lender's Costs"), may be added to the dollar amount of the post-petition claims granted to the Lender. [Interim Financing Order, ¶ 49].

v.  Lender will be provided access to information to the extent provided in the Financing Orders. [Interim Financing Order, ¶¶ 48].

o.  Sale Process.

i.  The Debtor will conduct a comprehensive marketing and sale process of its assets and businesses in accordance with each of the requirements and dates set forth in the Financing Orders. [**Exhibit 3** to the Interim Financing Order].

## THE DEBTOR' SECURED DEBT

9.      The Debtor is indebted to Lender pursuant to certain documents executed and delivered to Lender by the Debtor, including, without limitation, that certain Credit Agreement dated April 27, 2012 (as heretofore amended and supplemented from time to time, the "First Lien NPA").

10.     The First Lien NPA and all notes, security agreements, assignments, pledges, mortgages, deeds of trust, guaranties, forbearance agreements, letters of credit, and other instruments or documents executed in connection therewith or related thereto are referred to herein collectively as the "Pre-Petition Claim Documents."

11.     Pursuant to the Pre-Petition Claim Documents and applicable law, Lender holds a valid, enforceable, and allowable claim against the Debtor, as of the Petition Date, in an aggregate amount of at least $25,000,000 of unpaid principal, plus any and all accrued and unpaid interest, fees, costs, expenses, charges, and other claims, debts or obligations of the Debtor to Lender that have accrued as of the Petition Date under the Pre-Petition Claim Documents and applicable law.  The Lender's claim as described in the preceding sentence together with all post-Petition Date interest, fees, costs, and charges allowed to the Lender on such claim pursuant to Bankruptcy Code § 506(b) shall collectively be referred to hereunder as the "Pre-Petition Claim".

12.     The Lender Pre-Petition Claim constitutes an allowed, legal, valid, binding, enforceable, and non-avoidable obligation of and claim against the Debtor and Guarantors, and is not subject to any offset, defense, counterclaim, avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or any other applicable law, and the Debtor and Guarantors do not possess and cannot assert any claim, counterclaim, setoff, or defense of any kind, nature, or description which would in any way affect the validity, enforceability, allowance, and non-avoidability of Lender Pre-Petition Claim.

13.     Subject only to Prior Liens (if any), Lender Pre-Petition Claim is secured by properly perfected first priority liens and security interests in, *inter alia*, any and all assets and property of the Debtor, now owned or hereafter acquired, real and personal, and the proceeds and

products thereof (collectively and as defined in the Interim Financing Order, the "Pre-Petition Collateral").

14.    Additionally, all cash of the Debtor's bankruptcy estate, wherever located, and all cash equivalents, whether in the form of negotiable instruments, documents of title, securities, deposit accounts, investment accounts, or in any other form, that were on the Petition Date in any of the Debtor's possession, custody or control (or persons in privity with any of the Debtor), or in which the Debtor will obtain an interest during the pendency of the Case whether via advances under the DIP Facility or otherwise, or which represent income, proceeds, products, rents, or profits of any of the Collateral is the cash collateral of Lender (collectively, the "Cash Collateral").  Lender has a first priority perfected lien and security interest in the Cash Collateral pursuant to the applicable provisions of the Pre-Petition Claim Documents and Bankruptcy Code §§ 363(a) and 552(b).

15.    The security interests and liens of Lender do not have priority over any other valid, perfected and unavoidable liens and security interests of any other secured creditor in any assets of any of the Debtor existing on the Petition Date that are senior in priority under applicable law to Lender's liens and security interests granted under the Pre-Petition Claim Documents in the Pre-Petition Collateral (collectively, the "Prior Liens").  The Debtor and Lender, reserve the right to object to the validity, priority, or extent of any asserted Prior Lien, or the allowance of such debts secured thereby, or to institute any actions or adversary proceedings with respect thereto.

## **RELIEF REQUESTED**

### **Introduction**

16.    The Debtor does not have sufficient available sources of working capital or cash to continue the operation of its business without access to the DIP Facility and use of Cash

Collateral.  The ability to obtain sufficient working capital and liquidity through the DIP Facility and use of Cash Collateral is vital to the preservation and maximization of the value of the Debtor's assets and to successfully reorganize the Debtor.

17.     By this Motion, the Debtor requests that this Court enter orders authorizing the Debtor to enter into the DIP Facility with Lender pursuant to Bankruptcy Code §§ 105, 361, 362 and 364.  Furthermore, pursuant to Bankruptcy Code § 363(c), the Debtor requests authorization to use Cash Collateral as set forth herein and in the Financing Orders.

18.     The DIP Facility and use of Cash Collateral are necessary to avoid immediate and irreparable harm to the Debtor and its estate.  Accordingly, the DIP Facility and use of Cash Collateral pursuant to the Financing Orders is in the best interests of the Debtor's estate and creditors.   The proposed DIP Facility and use of Cash Collateral will fund necessary restructuring costs and other essential costs as the Debtor moves toward a sale of its assets. These costs are set forth in the Budget and include, *inter alia*, the Debtor's operating expenses, marketing expenses, professional fees, fees due under 28 U.S.C. § 1930, insurance, taxes, and other miscellaneous costs.  The Budget sets forth the proposed uses of the DIP Facility and Cash Collateral for a 13-week period through April 15, 2016.

19.     In order to maintain normal operations, the Debtor is requesting an emergency interim hearing on this Motion.

### The DIP Facility Satisfies the Requirements of Bankruptcy Code § 364

20.     As a result of, among other things, the Debtor's financial condition and pre-petition capital structure and the state of credit markets in general, the Debtor has been unable to obtain other sources of cash or credit in the form of unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense pursuant to Bankruptcy Code § 364(a) or (b) or on a secured basis pursuant to Bankruptcy Code §364(c)(2)&(3) by granting liens that are

subordinate to existing lien claims or upon assets that are otherwise unencumbered. Financing on a post-petition basis is not otherwise available without the Debtor's granting, pursuant to Bankruptcy Code § 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b), and securing such indebtedness and obligations with the superpriority security interests in and the liens upon the property described below pursuant to Bankruptcy Code §§ 364(c) and 364(d).

21.    The terms of the DIP Facility and adequate protection arrangements discussed below are fair and reasonable under the circumstances, reflect the exercise of prudent business judgment by the Debtor consistent with its fiduciary duties and are supported by reasonably equivalent value and fair consideration. The Debtor believes that the DIP Facility will give it the necessary liquidity it needs to operate its business while pursuing a sale of substantially all its assets in order to maximize the value of its estate. The DIP Facility will minimize disruption of the business and operations of the Debtor and permit the Debtor to meet payroll and other operating expenses, obtain needed supplies and maintain the going concern value of its business by demonstrating an ability to maintain normal operations. The DIP Facility should be approved under Bankruptcy Code § 364 because "the credit acquired is of significant benefit to the Debtor's estate and the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the Debtor to obtain comparable credit elsewhere." *In re Aqua Associates*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991). The Debtor submits that it has met the requirements under Bankruptcy Code § 364 to obtain post-petition financing and that the Motion should be granted.

22.    The Debtor is without adequate funds, absent access to the DIP Facility, with which to operate its business. The DIP Facility is vital to avoid immediate and irreparable harm

to the Debtor's estate and business. The Debtor thus requests emergency, interim authorization to use the DIP Facility on the basis as set forth in the Budget, in an amount not to exceed $400,000.00, prior to the Final Hearing. The expenses listed on the Budget are reasonable and necessary business expenses that must be paid in order to continue the Debtor's business. Because the Debtor's request for interim authorization seeks the use of only that amount of DIP Facility as is necessary to avoid immediate and irreparable harm to its estate pending Final Hearing, this request complies with Bankruptcy Rule 4001.

23.     The Debtor proposes and seeks through this Motion that upon entry of the Final Financing Order authorizing use of the DIP Facility, the Debtor may continue to use the DIP Facility as set forth in the Budget for the subsequent time periods reflected in the Budget or any substitute budget, pursuant to the DIP Agreement and the Financing Orders.

## Immediate Need for Use of Cash Collateral

24.     Bankruptcy Code § 363(c) provides, in relevant part:

(c)     (1)     If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

(2)  The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless –

(A)   each entity that has an interest in such cash collateral consents; or

(B)  the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. §§ 363 (c)(1), (2).

25.     As set forth above, the Debtor also has an immediate need to use Cash Collateral to continue the operation of its business. Without the use of Cash Collateral, the Debtor will not

have the funds necessary to conduct its business, maintain its assets, sell or otherwise liquidate its assets, provide financial information, and pay employee compensation, payroll taxes, overhead, and other expenses necessary to maximize the value of the Debtor's estate.

26.     The Debtor requests interim authorization to use Cash Collateral as set forth in the Budget until the Final Financing Order granting further use of Cash Collateral can be entered. The Budget itemizes the weekly uses of cash and list of business expenses that are reasonable and necessary and that must be paid in order to continue the Debtor's business until such time as the Final Hearing on the Motion can be held.

27.     The Debtor is without sufficient funds, other than Cash Collateral, to operate for fifteen or more days until the Final Hearing on this Motion can be held.  The Debtor's inability to timely pay the costs and expenses set forth herein will result in immediate and irreparable harm to its assets.  Because the Debtor's request for interim authorization seeks the use of only that amount of Cash Collateral as is necessary to avoid immediate and irreparable harm to the value of its assets pending the Final Hearing, its request complies with Rules 4001(b)(2) of the Bankruptcy Rules.

28.     The Debtor also requests that the Court authorize it to continue to use Cash Collateral as set forth in the Budget or any substitute budget after the Final Hearing on the Motion.

### Grant of Adequate Protection

29.     Bankruptcy Code § 363(e) provides that "on request of an entity that has an interest in property used . . . or proposed to be used . . . , the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e). The providing of adequate protection is mandatory.  *See, e.g., In re Metromedia Fiber Network, Inc.*, 290 B.R. 487, 491 (Bankr. S.D.N.Y. 2003) ("Section 363(e) is not permissive or

discretionary – it states that the court 'shall' grant the relief specified . . . ."); *In re Heatron, Inc.*, 6 B.R. 493, 494 (Bankr. W.D. Mo. 1980) ("Providing adequate protection is mandatory."). Bankruptcy Code § 361 sets forth a non-exclusive list of forms of adequate protection, which include periodic cash payments, additional liens, replacement liens, and other forms of relief. 11 U.S.C. § 361.  A determination of adequate protection is decided on a case-by-case basis, involving a consideration of the "nature of the creditor's interest in the property, the potential harm to the creditor as a result of the property's decline in value and the method of protection." *In re Braniff Airways, Inc.*, 783 F.2d 1283, 1286 (5th Cir. 1986).  The purpose of adequate protection is to ensure that a secured party's economic position is not worsened because of the filing of a bankruptcy case.  *In re DeSardi*, 340 B.R. 790, 804 (Bankr. S.D. Tex. 2006).

30.    As adequate protection of Lender's interests in the Collateral, the Debtor proposes to grant certain adequate protection liens, superpriority liens, superpriority administrative status, and adequate protection payments that it asserts will adequately protect Lender for the use of Cash Collateral.   The DIP Liens shall be subject and junior only to (i) the Carve-Out Expenses; (ii) chief restructuring officer and the management incentive plan (collectively the "Budgeted Operating Expenses:"); (iii) valid and enforceable M&M Liens in respect of the Everest 1-9MH well only ("Everest M&M Liens") to the extent such Everest M&M Liens are valid, enforceable, non-avoidable, and perfected and are, under applicable law, senior to the liens and security interests of the Lender in the Pre-Petition Collateral, except to the extent the DIP Liens secure advances for the reasonable, necessary costs and expenses of preserving, or disposing of, the Everest 1-9MH well as determined by the Court under Bankruptcy Code §506(c); and (iv) valid and allowed claims of royalty interest and working interest holders for unpaid proceeds of production arising after the Petition Date.

31.     The Debtor has a bona fide offer to buy substantially all of the Collateral (the same being virtually all of the Debtor's business assets) for at least $5,000,000 cash.  Such offer will be used as a stalking horse offer and serve as the basis for the auction sale to be conducted in this case.  As such, the Debtor submits that the value of the Collateral is at least $5,000,000 because a third party is willing to pay such for it.   Taking the Everest 1-9MH out of the Collateral, the Debtor submits the value of is remaining assets (the "Priming Collateral") are worth at least $4,000,000 so that the grant of the priming liens to the Lender in the Priming Collateral will not result in any harm to the approximately $100,000 in other existing liens upon the Priming Collateral.  As such, the grant of the priming liens upon the Priming Collateral will not result in any economic harm to any other party claiming a lien thereupon.

32.     The Debtor also provides Lender with ample information relating to projected revenues and expenses, actual revenue and expenses, and variances from the Budget.  This information will enable Lender to monitor its interests in the Pre-Petition Collateral and Cash Collateral.  Reporting of financial information is also a form of adequate protection.  *See, e.g., Mutual Benefit Life Ins. Co. v. Stanley Station Assocs., L.P. (In re Stanley Station Assocs., L.P.)*, 140 B.R. 806, 809 (D. Kan. 1992) ("In addition, we believe the request of MBL for 'timely filing of proper monthly operating reports . . .' falls within the ambit of adequate protection . . . ."); *Sumitomo Trust & Banking Co. v. Holly's, Inc. (In re Holly's, Inc.)*, 140 B.R. 643, 706 (Bankr. W.D. Mich. 1992) (reports required as part of adequate protection).

33.     Additionally, the Financing Order contains numerous findings, terms, and agreements between the Debtor and Lender to protect Lender in exchange for Lender's consent to the Debtor use of Cash Collateral.  Such findings, terms, and agreements are important protections of Lender that constitute additional adequate protection of Lender.

## FINAL HEARING

34.     The Debtor requests that the Court order that any objection to the entry of the Final Financing Order be required to be filed on or before 4:00 p.m. Central time at least 5 business days prior to the Final Hearing (the "Objection Date") and that the Court set the Final Hearing on this Motion on or before February 29, 2016.  The Debtor further request that the Court order that objections, if any, to the Motion must be in writing and filed with the clerk of the Court so that any such objections are received on or before the Objection Date.

## NOTICE

35.     Pursuant to Bankruptcy Rule 4001, the Debtor has caused a copy of this Motion to be served by e-mail, facsimile, or overnight delivery upon (i) the proposed Master Service List, which includes Lender, and its counsel; (ii) the United States Trustee; (iii) those persons who have formally appeared in the Case and requested service pursuant to Bankruptcy Rule 2002; and (iv) all applicable government agencies to the extent required by the Bankruptcy Rules and the Local Rules.

## PRAYER

The Debtor respectfully requests that the Court enter the Financing Orders (i) approving the terms of the DIP Facility on an interim and final basis, (ii) authorizing the use by the Debtor of any Cash Collateral as set forth therein on an interim and final basis, (iii) approving and granting such measure of adequate protection as set forth therein, and (iv) granting any and other such further relief to which the Debtor may be justly entitled.

Dated: February 4, 2016

Respectfully submitted,

**CROWE & DUNLEVY**

*/s/ Mark A. Craige*
Mark A. Craige, OBA No. 1992
Michael R. Pacewicz, OBA No. 18794
500 Kennedy Building
321 South Boston Avenue
Tulsa, Oklahoma 74103-3313
918.592.9800 Telephone Number
918.592.9801 Facsimile Number
e-mail address:
mark.craige@crowedunlevy.com
michael.pacewicz@crowedunlevy.com

*Attorneys for Debtor In Possession*

## <u>CERTIFICATE OF CONFERENCE</u>

I certify that I have contacted counsel to Lender concerning the relief requested herein. I have also have caused the U.S. Trustee to be provided a copy of this Motion and the related proposed Financing Orders. The Debtor will continue to discuss the requested relief with the U.S. Trustee and counsel to Lender.

*/s/ Mark A. Craige*
Mark A. Craige