Privileged and Confidential

# OSAGE EXPLORATION AND DEVELOPMENT, INC.
## Debtor-In-Possession (DIP) Financing Term Sheet[1]
### CONFIDENTIAL TERM SHEET

### SUBJECT TO BANKRUPTCY COURT ORDER

| | |
|---|---|
| Facility | Senior Secured Multiple Draw Term Loan superpriority, debtor-in-possession credit facility ("**DIP Facility**") |
| Facility Size | $1,400,000 maximum commitment to be funded in accordance with the DIP Facility Documentation and Budget.  Amounts repaid may not be reborrowed.  Until the entry of the Final Order, a maximum of $400,000 will be available under the DIP Facility.  The Budget will include a schedule of timing and amount of projected drawings under the DIP Facility. |
| Targeted Petition Date | February 3, 2016 |
| Bankruptcy Case | Chapter 11 case to be filed and maintained in the United States Bankruptcy Court for the Western District of Oklahoma (the "**Bankruptcy Court**"). |
| Borrower | Osage Exploration and Development, Inc.  (the "**Borrower**" or "**Debtor**") |
| Effective Date of DIP Facility | Upon entry of Interim DIP Order (for interim amount). |
| Priority | Super-priority administrative claim against Borrower.  Super-priority senior lien, pursuant to section 364(d) of the Bankruptcy Code, against all assets of Borrower, whether real or personal, including postpetition assets (including avoidance actions), subject only to (i) the Carve-out Expenses, (ii) budgeted expenses for compensation of the CRO and the management incentive plan ("**MIP**") (collectively the "**Budgeted Priority Operating Expense**") , (iii) valid and enforceable M&M Liens in respect of the Everest 1-9MH well only ("**Everest M&M Liens**") to the extent such Everest M&M Liens are valid, enforceable, non-avoidable, and perfected and are, under applicable law, senior to the liens and security interests of the First Lien Holders  in the Collateral, |

---

[1]. Final documentation for the financing (including the DIP Orders) may contain additional terms and provisions from the terms and provisions of this Term Sheet.

1

**EXHIBIT B**

| | |
|---|---|
| | except to the extent the DIP Liens secure advances for the reasonable, necessary costs and expenses of preserving, or disposing of, the Everest 1-9MH well as determined by the Court under Bankruptcy Code §506(c) and (iv) valid and allowed claims of royalty interest and working interest holders for unpaid proceeds of production arising after the Petition Date. |
| DIP Lender | Apollo Investment Corporation or one or more of its affiliates ("**Apollo**") or any other lender entity designated by Apollo. |
| First Lien Holders | Apollo and any assignees from time to time in their capacity as holders under Note Purchase Agreement dated as of April 27, 2012 (as amended). |
| First Lien Adequate Protection | As part of the DIP Orders, the liens and obligations of the First Lien Holders shall be acknowledged, affirmed and validated by the estates, subject to any action commenced by a creditor of the Debtors no later than 30 days following the Petition Date.  The First Lien Holders will also receive replacement liens on all assets of the Debtor and superpriority claims under Section 507(b) of the Bankruptcy Code to the extent of any diminution in the value of their collateral, which replacement liens and claims shall be senior to all other liens and claims, subject only to the liens and claims in favor of the DIP Facility and any senior liens of materialmen and mechanics as of the Petition Date.  In addition, the Budget shall provide for adequate protection payments to the First Lien Lenders in the amount of $75,000 per month. |
| Budget | A thirteen week budget to be agreed upon among the parties with respect to revenues and expenses (the "**Budget**").  An updated Budget for each successive four week period (or longer time agreed among the parties) shall be provided to DIP Lender not less than two weeks prior to the end of the time period covered by the then effective Budget and shall be effective upon agreement by the parties.  There shall be an event of default if (i) total disbursements for any weekly time period of the Budget shall have exceeded the total disbursements allowed in the Budget by more than 10%, (iii) total disbursements for any line item in the Budget for any weekly time period shall be exceeded by more than the greater of 25% or $10,000, (iv) total net revenue for any production month received Post Petition shall fall below $125,000 attributable to the Debtor's net revenue interest or (v) the Budget amount is exceeded by any amount for certain specific items to be agreed to by the parties. |

2

| Use of Proceeds | For general corporate purposes in accordance with the DIP Facility Documentation and the Budget. No proceeds of the DIP Facility and no cash collateral (including the Carve-Out Expenses), may be used in connection with (a) the modification, stay, or amendment of the DIP Orders without the consent of the Lenders or (b) the investigation of, preparation for, or commencement or prosecution of any litigation, proceeding or adverse action against, or challenge to the rights, validity and/or the first-priority status of liens and prepetition secured claims of the DIP Lender or the First Lien Lenders. The Debtor may segregate proceeds into a separately designated bank account for payment of Carve-Out Expenses. Carve-Out Expenses will only be paid upon issuance of appropriate order(s) of the court for allowance of professional fees. Such segregation shall be limited to the amounts set forth in the Budget. |
|---|---|
| Interest Rate | 8% per annum, payable in arrears at the end of every calendar month at maturity. Default rate of 2% payable upon and during continuance of event of default. The payment may be deferred for a period up to ninety days if requested by the Debtor due to liquidity constraints and consented to by the DIP Lender at the DIP Lender's sole discretion. |
| Facility Fee | 2% of all amounts actually funded under the DIP Facility, payable on the date of the applicable funding. |
| Exit Fee | 2% of the total amount advanced under the DIP Facility. payable upon Maturity, or at the time of any earlier payments of DIP Facility to the extent of such payments. |
| Collateral | Pursuant to Sections 364(c) and (d) of the Bankruptcy Code, all obligations of the Debtor under the DIP Facility ("**DIP Obligations**") will be secured by security interests ("**DIP Liens**") in all of the Debtor's and its bankruptcy estate's assets (the "**Collateral**"), including proceeds and rights in respect of avoidance actions under sections 510, 544, 547, 548, 549, 550 and/or 551 of the Bankruptcy Code ("Avoidance Actions"). Collateral shall include all property that is not subject to a security interest or lien as of the Petition Date and property that is covered by a security interest or lien as of the Petition Date. Such liens on the Collateral will be valid, enforceable and perfected first-priority priming liens and security interests, with priority over any and all prepetition or postpetition liens, security interests and other interests including any and all mechanics and materialmens' liens ("**M&M Liens**") (except for the Everest M&M Liens described below) and shall be |

3

|  | |
|---|---|
|  | subject and junior only to (i) the Carve-Out Expenses, (ii) Budgeted Priority Operating Expenses, (iii) valid and enforceable Everest M&M Liens in respect of the Everest 1-9MH well only to the extent such Everest M&M Liens are valid, enforceable, non-avoidable, and perfected and are, under applicable law, senior to the liens and security interests of the First Lien Holder in the Collateral, except to the extent the DIP Liens secure advances for the reasonable, necessary costs and expenses of preserving, or disposing of, the Everest 1-9MH well as determined by the Court under Bankruptcy Code §506(c), and (iv) valid and allowed claims of royalty interest and working interest holders for unpaid proceeds of production arising after the Petition Date.  The DIP Lender shall also have a superpriority administrative expense under section 364(c)(1) against the Debtors for the amount of all obligations under the DIP Facility, subject only to the Carve-Out Expenses and Budgeted Priority Operating Expenses.  No person other than the DIP Lender shall have a lien on the collateral, except for (i) the liens of the First Lien Holders (including adequate protection liens provided herein) and (ii) M&M Liens (it being understood that pursuant to the DIP Orders any and all such liens will be junior to the DIP Facility). |
| Maturity | The earlier of: (i) the effective date of a chapter 11 plan for the Debtor; (ii) the sale of all or a substantial part of the assets of the Debtor (including any sale of any of the eight wells currently operated by the Debtor, or (ii) April 25, 2016 ("**Final Maturity Date**"), or (iii) the occurrence and declaration of an Event of Default. |
| Amortization | None; provided that in the event that the Debtor receives proceeds in respect of amounts currently held by Energy Financial as first purchaser, 50% of such amount shall be used to permanently repay obligations under the DIP Facility. |
| Repayment | Borrower may repay the DIP Obligations in whole or in part at any time without premium or penalty (other than the applicable Exit Fee).  At Maturity, advances under the DIP Facility shall be repaid in full, together with accrued interest and Exit Fee on amounts advanced. |
| Conditions Precedent for effectiveness of DIP Facility and each funding | Conditions customary for facilities of this type, and other conditions including:<br><br>(a) completion of due diligence of DIP Lender prior to Petition Date with satisfactory results;<br><br>(b) Debtor shall enter into a satisfactory MIP with appropriate milestones and incentives with the purpose of consummating |

4

the Section 363 Sale prior to Final Maturity Date. The MIP shall include but not be limited to the following terms: payment of $100,000 plus 3% of the gross sale proceeds approved pursuant to Section 363; provided that (1) the aggregate payments made pursuant to the MIP shall not exceed $270,000, and (2) payments under the MIP shall be earned by management only if they remain employed by the Borrower until the Final Maturity Date (as such date may be extended) and shall not be payable until sale of all or a substantial part of the assets of the Debtor. The MIP shall be documented in a separate agreement that is acceptable to the DIP Lender.

(c) Bankruptcy Court approval of DIP Facility on an interim basis no later than February 9, 2016 (the "**Interim DIP Order**") and, on a final basis no later than February 29, 2016 (the "**Final DIP Order**" and, collectively with the Interim Order, the "**DIP Orders**").[2]

(d) DIP Orders to be subject to the Budget, which will provide only for the payment of necessary cash operating expenses of the Debtor and necessary non-deferrable capital expenditures, and not any intercompany payments or allocations, including with respect to professionals fees and expenses except in accordance with the Budget;

(e) Each borrowing shall be consistent with the most recently delivered and approved Budget subject to any variances as permitted by the DIP Facility Documentation;

(f) Interim Order and Final Order to be acceptable to the DIP Lender and shall include provisions relating to DIP Facility that are customary for facilities of this type and other provisions acceptable to DIP Lender and to the First Lien Holders (with respect to adequate protection);

(g) execution and delivery of DIP Facility Documentation and other customary loan documents in form and substance satisfactory to the DIP Lender;

(h) All first day motions filed by the Debtors and all first day orders entered on the docket of the Bankruptcy Court shall be satisfactory to the DIP Lender;

(i) Absence of any continuing default or Event of Default;

(j) The DIP Lender shall be satisfied in good faith with the progress of the 363 Sale Process including, without limitation, the likelihood of consummating a Section 363 Sale prior to the Maturity Date in an amount at least sufficient to repay the DIP

---

[2] In light of the negotiation of a possible stalking horse purchaser agreement, the Final DIP Order and the Final DIP Documentation may contain provisions, at the sole discretion of the DIP Lender, that reflect or relate to any such agreement or related Section 363 Sale.

| | |
|---|---|
| | Facility in full;<br><br>(k) No material adverse change shall have occurred with respect to the, operations, properties, or financial condition of the Debtors, taken as a whole, since the commencement of the Chapter 11 Cases; and<br><br>Completion of this DIP Term Sheet on or before February 3, 2016 |
| Covenants | Customary affirmative and negative covenants for facilities of this type, and this transaction in particular, including:<br><br>(a) reasonable access to information relating to the Debtor and close consultation with DIP Lender regarding the sale process and progress as to Sale Milestones;<br><br>(b) compliance with Budget;<br><br>(c) operating covenants regarding revenues in accordance with the Budget;<br><br>(d) other covenants contained in existing Note Purchase Agreement; and<br><br>(e) Debtor shall consult with DIP Lender as to the 363 Sale Process and any stalking horse agreements shall be acceptable to the DIP Lender; and<br><br>(f) Other provisions to be contained in DIP Orders and Final DIP Documentation. |
| 363 Sale Process and Sale Milestones | It is anticipated that the Debtors will commence a process (the "**363 Sale Process**") immediately following the Petition Date to solicit bids and conduct a sale to one or more third party(ies) prior to the Final Maturity Date pursuant to Section 363 of the Bankruptcy Code of all or substantially all of their assets ("**Section 363 Sale**"). The DIP Facility is being provided by the DIP Lender in reliance upon the promulgation and consummation of the 363 Sale Process. In connection with the 363 Sale Process, the DIP Facility Documentation and DIP Orders will contain milestones and other covenants related to the 363 Sale Process including the following milestones ("**Sale Milestones**") (i) completion of data room no later than February 2, 2016, (ii) circulation of summary offering memorandum to prospective bidders no later than February 5, 2016, (iii) entry into stalking horse asset purchase agreement no later than February 12, 2016, (iv) entry of order relating to bidding procedures no later than February 26, 2016, (v) entry of order(s) approving transactions relating to the sale of all or substantially all of the assets of the Debtors no later than March 25, 2016 and (vi) closing of transactions relating to sale of all or substantially all of the assets of the Debtors no later |

Privileged and Confidential

| | |
|---|---|
| | than April 13, 2016. |
| Events of Default | Customary and appropriate for financings of this type, including the following:<br><br>(a) breach of Budget amounts in excess of permitted variances;<br><br>(b) customary bankruptcy events of default, including conversion or dismissal of case, appointment of trustee or examiner;<br><br>(c) change of venue of case from the Western District of Oklahoma;<br><br>(d) reversal or modification of any of the DIP Orders without the consent of the DIP Lender;<br><br>(e) granting of relief from the stay to any creditor in respect of any Collateral;<br><br>(f) other breaches of covenants, subject to customary grace periods and cure periods if applicable;<br><br>(g) the Debtor shall propose a plan of reorganization that either (i) does not contemplate the full repayment in full in cash of the DIP Facility on the Effective Date or (ii) is not otherwise reasonably acceptable to the DIP Lender;<br><br>(h) failure to achieve Sale Milestones;<br><br>(i) payment defaults; and<br><br>(j) other defaults to be included in Final DIP Documentation and DIP Orders. |
| Remedies | During the continuance of an Event of Default, any DIP Lender can exercise all remedies under applicable bankruptcy and/or non-bankruptcy law with respect to the Collateral and the automatic stay shall not apply to any such remedies. |
| Carve-Out Expenses | The DIP Lender's liens and administrative claims shall be subject to the prior payment of the Carve-Out Expenses. "**Carve-Out Expenses**" shall mean (i) allowed, accrued, but unpaid professional fees of the Debtors and one official committee of creditors consistent with and not in excess of the amounts included in the Budget which have been incurred prior to the occurrence and declaration of an Event of Default, (ii) allowed, accrued but unpaid professional fees and expenses incurred by the Debtors and such official committee of creditors consistent with the Budget which are incurred after the declaration of an Event of Default (that is not cured or waived) in an aggregate amount not to exceed $75,000, and (iii) fees payable to the U.S. trustee pursuant to 28 U.S.C. § 1930 and to the clerk of the Bankruptcy Court; provided, however, that the Carve-Out Expenses shall not include (a) any |

7

Privileged and Confidential

|  | |
|---|---|
|  | other claims that are or may be senior to or pari passu with any of the Carve-Out Expenses, (b) any fees or expenses of a Chapter 7 trustee, (c) any fees or disbursements arising after the conversion of any of the Chapter 11 Cases to a Chapter 7 Case (d) any fees or disbursements related to the investigation of, preparation for, or commencement or prosecution of any litigation, proceeding or adverse action against, or challenge to the rights, validity and/or the first-priority status of liens and prepetition secured claims of the First Lien Lenders or (e) any fees or disbursements related to any challenge or objection to the debt or collateral position of the DIP Lender or hindering or delaying the DIP Lender's enforcement or realization upon the Collateral once an Event of Default has occurred and is continuing. |
| DIP Facility Documentation | The debtor-in-possession financing agreement (the "**DIP Agreement**") and all other documents, agreements, certificates and opinions to be executed or delivered, or relating to the transactions contemplated to be in form and substance acceptable to DIP Lender in their sole discretion.  In the sole discretion of the DIP Lender, funding under the Interim DIP Order (or if decided by the DIP Lender, funding under the Final DIP Order) may be made on the basis of a "short form" promissory note and the DIP Orders. |
| Governing Law | New York |
| Representations & Warranties, Deliverables, Assignment Provisions, Amendment Provisions, Expenses, Indemnities, Jurisdiction, Other Provisions | Customary for financings of this type and for this transaction in particular. |

8